United States v. Pablo Plaza. May he please the court. How can you reasonably... Just to be clear at the outset, you've not reserved any rebuttal time. Well, unfortunately, Judge, the trip from Rochester this morning was like a train, planes and automobiles. So I was unable to sign up initially. So I will not ask for a two-minute rebuttal. Thank you. And I apologize for coming late. How can you reasonably foresee an occurrence as a necessary or natural consequence of an unlawful agreement that had never happened before in the, in this case, five-year history on the conspiracy? Count 14 charged Pablo Plaza with the intentional murder of Francisco Santos while engaged in a narcotics conspiracy. Taking the evidence in a light most favorable to the government as we must, Santos was a brother and others. The defendant believed Santos had stolen narcotics from him, from his safe. That the defendant and another shot at a house that they believed that Santos resided as a result of the theft. And that the defendant also assaulted Santos several months earlier with a box cutter knife. However, the government must concede that the defendant was in custody at the time they alleged that Santos homicide. What difference does that make if all his pals and his brothers were there, had seen what he had done, and had in effect said, will no one rid me of this meddlesome clerk to cite something rather different? It happens all the time that people in authority say things which foreseeably lead others to kill people. I mean, we have that all over the newspapers now with respect to Saudi Arabia. I mean, it's just the most common thing in the world. And the fact that he's in custody at the time, what difference does that make if people understand what he wants? Well, Your Honor, I respectfully disagree with your assessment. In this case . . . Well, it's not my assessment. It's the jury's assessment. And the question is, is there enough evidence on that so that a jury could find that link? I'm not . . . you know, that's a very different thing. Understood, Judge. But in this case, there was no conversation whatsoever between the defendant and the others to plot and to plan . . . Why does he have to have a conversation? I mean, action speaks louder than words. He put a four-inch-long, one-inch-deep gash in Santos' head. There had never been in this conspiracy an incident involving an intentional or unintentional homicide. Recall that the indictment charged an intentional murder as opposed to a negligent murder or some other form of homicide or assault. In this particular case now, the . . . Isn't the question whether, and correct me if I'm wrong, whether Plaza reasonably could be said to foresee Santos' murder? That is the question, but I answer that question, no. Because . . . You answered that question, no, and that's a perfectly possible answer. The jury answered the question, yes. And the question before us is, is it possible for reasonable people on these facts to answer that question the opposite way from the way you did? Though it certainly is possible to answer it the way you did. Your Honor, under Pinkerton, Pinkerton did not create a broad principle of vicarious liability that imposes criminal responsibility upon every co-conspirator for whatever substantive crimes may have occurred. And also, as this Court has stated, just because . . . Why isn't it enough that there was testimony from Philip Barnes that . . . and I'm looking at 973, he, meaning Mr. Plaza, said that the police had arrested him for assault second at his house on Phelps and that he made the police take his shoes off and so on. And then he says about Sisko, Mr. Santos' death, that he was not going to go back to prison. He did it because he was not going back to prison for assault second. Was that not the testimony? That was the testimony. Why isn't that . . . Because . . . Enough. Because of the circumstances, one, the defendant being in jail, two, that there were no details concerning how my client would have communicated the request for the homicide to the others. It's just a ball . . . In your approach, did you have a conversation with Paul Plaza? Yes. And what did Paul Plaza tell you when I told him about the police was coming around questioning me about . . . me asking about Santos, Sisko? He said that he did it because he was not going back to prison. Why isn't that a direct evidence? Well, Your Honor, because it's impossible for him to do it. He was in custody at the time. And there's nothing beyond that one statement which would give an indication . . . Well, the statement, I did it, doesn't mean I pulled the trigger. It can mean I let people know, suggested, acted in ways so that they might do it. Well, Your Honor, I don't believe . . . I mean, there's no doubt that he didn't pull the trigger, but it was his brother. Right. And there's nothing from Barnes' testimony to explain or to say that my client had said that the others had done it. It was just simply the statement that I had done it. So I don't believe that that would be enough for the jury to go to the issue that this was a natural consequence of the conspiracy. That is, an intentional murder as opposed to an assault. I can agree that assault would have been a natural foreseeable consequence, so an intimidation. But to go as far as an intentional murder, Judge, I don't believe the jury could have done that. What do you take this, I did it, to mean? Are you saying that he was just lying or bragging or talking about things which weren't there? What does that mean? Well, Your Honor, in my humble opinion, I take it literally. I did it. But, of course, he could not have done it. Well, but I did it can be I did it through other people, can't it? Can't it be read that way by a jury? I don't agree, Judge. No? Okay. Could you move on to your 87 Thomas Street argument? Yes. Certainly. Looking at the evidence in a light most favorable to the government, a drug conspiracy existed. Heroin was being packaged at 87 Thomas Street, and the defendant most probably received some heroin from 87 Thomas Street. But there was no testimony to say that the defendant ever participated in the packaging or manufacturer distribution there, no testimony that he ever entered into 87 Thomas Street. And the government conceded . . . But given, you know, you've got . . . it's a large operation . . . Yes. . . . which he knew about, and the witnesses knew about it, his role in the conspiracy, he knew that the . . . that Gonzalez lived at 87 Thomas Street, right? But . . . So wouldn't . . . wouldn't . . . couldn't a jury infer that he understood that his co-conspirators used 87 Thomas Street for the principal purpose of readying heroin for sale? No. No, Chief Judge. And that's because there was no testimony, no nexus in the testimony to show that the defendant had knowledge that there would be a narcotics distribution or manufacturing at 87 Thomas Street. And Mr. Gonzalez testified that he . . . that Mr. Plaza came to 87 Thomas Street at one point looking for drugs? The testimony . . . no. The testimony was that he drove up . . . the testimony was that Gonzalez had stolen some and another one in a car outside of his residence. And that's it. There was nothing about him going into the house, going to the door, so just the mere fact that he was . . . Mr. Gonzalez made it clear that he had a gun? Is that . . . No. Mr. Gonzalez did have a gun inside the house, but he remained quiet, if I recall the testimony correctly. So I don't know how my client would have foresaw, to use a bad word out, that he had a weapon there. But to say otherwise, Judge, would basically say in any kind of large-scale narcotics conspiracy, that any place where it's being manufactured, that a co-conspirator is going to have to have knowledge that this was going on in a certain location. And I don't believe that that would be a true reading or a true verdict that a jury can give. In this situation, it was simply . . . and the government conceded that the defendant did not participate in the bagging. So to link Mr. Plaza with the operation there, and also the testimony involved Franklin Gonzalez doing the operation with Kendrick and then selling it to Plaza. If we agreed with you about that, what would be the consequence in terms of the sentences? Frankly . . . If we disagreed with you about the murder, but agreed with you about this, what would be the consequence? To use a non-legal word, bupkis. It's not going to make much of a difference, really, to the ultimate sentence. No, it wouldn't make any difference. You say much of a difference. I don't know what bupkis means, so . . . I'm sorry. It means nothing. And basically, no, it would not change the ultimate sentence. I have to concede that. In other words, it would be harmless. Well, it would be harmless as far as the sentence is concerned. But as far as the $100 surcharge is concerned, it's not harmless.  Thank you. Thank you. Monica Richards, on behalf of the United States of America, with regard to this appeal. With regard to the Santos murder, based on the court's questioning of my opponent, I believe that Section 4, aiding and abetting under Section 2, was appropriately charged here and what the jury determined was that there was sufficient evidence with regard to those aspects. We know that he wasn't in jail. But doesn't the fact that he wasn't in jail suggest that he's taking credit for it after the fact? Maybe. I don't know what the point . . . Not that he did it. Right. Not that . . . I mean, he couldn't have done it because he wasn't there. Right. The jury evaluated the testimony that he was in jail and that he said he did it, but it also heard all these other things. So I couldn't answer the court's question one way or the other as to what the jury believed here, which is what's important. But I concede, as Your Honor suggests, it could be he was just bragging and taking credit. But that's not what the proof showed. You say that the jury could have read it differently, that we could read it in this way as saying I did it because these people did it and I'm glad it happened, which wouldn't be a crime, but that a jury could read it in a different way. There was sufficient evidence here with regard to his motivation. It wasn't for lack of trying that he didn't kill somebody either in the drive-by shooting at the parents' home or at the assault when he used a knife and hurt his head. That testimony really can't be disputed. Wasn't your better argument that it was reasonably foreseeable rather than it was aiding and abetting? Sure. Sure. Reasonably foreseeable. I mean, I could pick any of them. It doesn't matter with regard to what this Court has determined in this appeal. With regard to the strongest argument, I'm not sure that I would want to pick between those, but it was definitely reasonably foreseeable and that can't be denied either. Again, it wasn't for lack of trying that this gentleman wasn't hurt, injured, murdered in the course of the prior events, which were this specific defendant acting. This isn't like we're talking about some other conspirators going out and doing a drive-by or some other conspirators using a knife and slashing his head. We're talking about this defendant actually taking those acts. Here, it seems that, and correct me if I'm wrong, that the reason for the original attack on Santos was that he stole the safe. I believe that was the only reason for any of these attacks, Your Honor. While the motive for the actual murder was to prevent Santos from testifying. Oh, with regard to the assault, that's true. It doesn't mean that there weren't two motives, but I believe that, right, I would say that was a dual motive, yes. So you're saying that any time a co-conspirator has tried to attack someone, that that person's eventual murder is reasonably foreseeable regardless of the motive? No, we have a lot of other evidence here, Your Honor. With regard to these facts specifically, the timing we have, and again, as I mentioned, it was this particular defendant who undertook the prior acts, but we also have the timing that he was arrested and then Santos was kidnapped and killed that same day. And that he then talked to Philip Barnes about having killed him. So I think that those things, in that timing context, I wouldn't say every case, no. I would say with regard to the timing is significant in this case in terms of this Court's conclusion in that regard. With regard to the Count 5, the use of premises, the Court noticed, I don't know that, it does not have any impact on the ultimate sentence here, other than the $100, as was noted, but the concept of the Pinkerton liability with regard to the use of premises. The use of premises here, it's undisputed that this conspiracy used that location to package and prepare the guns for sale, I'm sorry, prepare the heroin for sale. And that plaza was the seller of it. So that he knew where it was, was also established in the record, and where under, again, under the Pinkerton liability, it was reasonably foreseeable that he knew that this location was used by his co-conspirators with regard to the drug trafficking activity. Isn't there somewhat of an inconsistent verdict regarding Plaza's participation in the sale of heroin in 87? There is. This whole verdict was a little confusing. The jury's inconsistencies also- In your brief, you described the jury's inconsistencies as how sophisticated the jury was in able to distinguish between one crime and another. This was a tricky verdict sheet. The verdict sheet in this case was immensely long, and it was a little tricky with regard to the jury's findings. It resulted in an acquittal for this defendant on count four with regard to the not proven findings. So, no, this jury did follow the directions as they were given to the best of its ability, and that's what we have here in terms of the result, is a verdict sheet that showed that they were taking it seriously. That they weren't just checking the guilty boxes all the way down the line. Is there a way to explain it? Is there a rational way to explain what the jury was thinking when, for example, acquitted on count four in the drug house count? Well, to be clear, the jury didn't acquit on count four. The jury found him guilty with regard to the possession with intent to distribute heroin from 87 Thomas Street. But then they checked the box with regard to the finding of not proven as to the amount. And so that was a sentencing matter. We did not take an appeal from that. We had other reasons, and we had sufficient other convictions here, so we didn't take an appeal from that. Was that purely a sentencing issue? I didn't understand that. Okay. Well, if I look at the jury, excuse me. It was, yes, it was not proven with regard to the drug amount. Your adversary, though, doesn't raise the inconsistency or inconsistency in this appeal. With regard to, I'm sorry, which count? Count four. No, they won. It was an acquittal. It was an acquittal. I don't know that it was or wasn't. I definitely responded. I mean, I noticed it, but no, I don't believe an inconsistent verdict. He's found guilty on count five, right? Yes. And prevailed on count four. Well, prevailed. Again, this is the tricky nature of this verdict sheet and what happened. Well, not proven is sufficient as being that they didn't split. Not proven is an acquittal. In our law, this isn't Scottish law, not proven is an acquittal. You can't try that one again. No, respectfully, Your Honor, well, no, we're not trying it again. But respectfully, the jury verdict was guilty as to count four. But then with regard to the special verdict, it was not proven. So that's not technically an acquittal. I mean, I understand we could talk about that. But with regard to the count five, again, we don't need to explain the inconsistency. Count five is a standalone count with regard to the use of premises. The other conduct having been the conduct of the co-conspirators with regard to count five. Unless there's any questions then about the evidentiary issues that were raised in points two and three, I'll rest on the brief. Thank you. Thank you. Thank you. Thank you both for your arguments. The court will reserve decision.